IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDWARD GUTIERREZ,

        Petitioner,

     v.

C. GIBSON, Warden, and LOPEZ, Former Warden,

        Respondents.

_____/

No. C-11-4740 TEH (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

Petitioner Edward Gutierrez, a state prisoner incarcerated at California State Prison – Corcoran, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now before the Court for consideration of the merits of the habeas petition.  For the reasons discussed below, the petition will be denied.

//

//

I

On May 7, 2008, a Santa Clara County jury convicted Petitioner of two counts of first degree burglary, one of which was enhanced for use of a deadly weapon (Cal. Penal Code §§ 459, 12022(b)(1)); and one count each of assault with a deadly weapon (id. § 245(a)(1)); vandalism (id. § 594(a), (b)(1)); possession of a billy club (id. § 12020(a)(1)); and misdemeanor being under the influence of methamphetamine (Cal. Health & Safety Code § 11550(a)). Clerk's Transcript (CT) 310-25. In a bifurcated proceeding, the court found true that Petitioner had three "strike" prior convictions (Cal. Penal Code § 1170.12); two prior serious felony convictions (id. § 667(a)); and three prior prison terms (id. § 667.5(b)). CT 326-27. On September 19, 2008, the trial court dismissed two of Petitioner's "strike" prior conviction findings and sentenced him to twenty-seven years and four months in state prison. CT 474-78. On August 12, 2009, the California Court of Appeal filed an unpublished opinion affirming the judgment. People v. Gutierrez, No. H033470, 2009 WL 2462075 (Cal. Ct. App. Aug. 12, 2009). On October 22, 2009, the California Supreme Court denied Petitioner's petition for review. Doc. 6-1 at 2. Petitioner also filed a petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on July 27, 2011. Doc. 6-2 at 2.

On September 19, 2011, Petitioner filed the instant federal petition. On April 9, 2012, this Court ordered Respondent to show cause as to why the petition should not be granted. Respondent filed an answer, and Petitioner filed a traverse.

2

II

The following factual background is taken from the order of the California Court of Appeal:

> On December 14, 2006, about 12:30 or 1:00 a.m., [Petitioner] entered Nicacio Hernandez's home with a baseball bat on his shoulder.  Hernandez did not know [Petitioner], but was able to identify him later. [Petitioner] hit Hernandez on the back of the head with a "very hard" "blow," causing Hernandez to fall to the ground.

> Juan Jimenez Rosas lived on the same street as Hernandez. On December 14, 2006, about 12:30 a.m., Rosas and his roommate came home and discovered their front door open. They had previously locked the door before leaving.  Items inside the residence had been disturbed.  A bottle of water was empty, the microwave was open, a coffee can had been emptied on the floor, a speaker and a vanity were broken, all the lights were on, clothing had been taken out from drawers, and a mattress was moved from the bed. Rosas later discovered that his Kodak camera was missing. At some point, an officer showed Rosas a camera, and it was the one that was missing from his house.

> On December 14, 2006, about 12:45 a.m., Anthony Garcia was awoken by pounding on the door.  He saw someone, who he later identified as [Petitioner], in front of his house. Garcia's fiancée, Susan Crisham, called the police. Garcia heard "a bunch of bashing and smashing" and then heard the alarm on Crisham's Acura Vigor, which was parked in front of their carport.  Garcia saw [Petitioner] hit the car with an object and then run off.  There was a flower pot in the vehicle's windshield, which was broken in two places, there was damage to the hood, which had a broken pot on it, and there was damage to the front fender.  The total amount of damage to the vehicle was $995.22.

> On December 14, 2006, about 12:45 a.m., Santa Clara County Deputy Sheriff Steve Gorshe responded to the vandalism call at the Garcia and Crisham residence.  While at that location, Deputy Sheriff Gorshe received a call concerning a man matching the description that had been provided by Garcia.  [Petitioner] was eventually located in a backyard that was a few houses down and around the corner from the Garcia and Crisham residence.  A billy club was found where [Petitioner] had been standing in the backyard.  The club looked like a "table leg drilled out with some duct tape."

3

> Based on [Petitioner's] behavior, including sweating profusely in the cold, smacking his lips, and being agitated and fidgety, Deputy Sheriff Gorshe believed that [Petitioner] might be under the influence of a stimulant. Sergeant Nuno Ribeiro of the Santa Clara County Sheriff's Department also observed [Petitioner] on December 14, 2006, and found him to have "classic symptoms of being under the influence of [a] stimulant," including dilated pupils, "watery eyelids," profuse sweating, and fidgeting.
>
> The Santa Clara County Sheriff's Office conducted a search of [Petitioner's] residence, which was near Rosas's residence. Rosas's Kodak camera was found inside [Petitioner's] backpack at [Petitioner's] residence.
>
> Alice King, a supervising criminalist with the Santa Clara County Crime Laboratory, testified that [Petitioner's] blood tested positive for methamphetamine and amphetamine. She explained that methamphetamine is a stimulant. Within hours of consuming it, a person's blood pressure and body temperature will "go up," and the person tends to sweat, have dilated pupils, and be very agitated and talkative. As time passes, a person may experience paranoia and hallucination.

Gutierrez, 2009 WL 2462075 at *2-3.

### III

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, a federal court may not grant a writ of habeas corpus on any claim adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court

4

may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. Only Supreme Court holdings that "squarely address[]" the issue presented are clearly established precedent under AEDPA. <u>Wright v. Van Patten</u>, 552 U.S. 120, 125 (2008). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76

5

(2003) (internal quotation marks and citations omitted).  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011) (citation omitted).

     When applying these standards, the federal court should review the "last reasoned decision" by the state courts.  Avila v. Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002).  Where, as here, the state court decision is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  This "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable."  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  See Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.

IV

A

Petitioner asserts various claims of ineffective assistance of his court-appointed counsel, Jessica Delgado, at preliminary hearing.  Doc. 1-1 at 3-5; Doc. 1-2 at 9-13.

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, id. at 687-68, "not whether it deviated from best practices or most common custom," Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citing Strickland, 466 U.S. at 690 ).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  Id. at 787 (quoting Strickland, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  A reasonable probability is a probability

**7**

sufficient to undermine confidence in the outcome.  Id.  Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential and when the two apply in tandem, review is doubly so."  Richter, 131 S. Ct. at 788 (internal quotation marks and citations omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Id.

1

a

Petitioner claims counsel Delgado "refused" to call witness in Petitioner's defense at the preliminary hearing.  Doc. 1-1 at 3.[1]

To succeed on a claim that counsel was ineffective in

---

[1]   When citing to the Petition, this Court will refer to the docket and page numbers used by the court's electronic filing program.

failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner.  See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner only provided his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony.  Id. at 486-87; cf. Alcala, 334 F.3d at 872 & n.3 (distinguishing, inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted interviews reflecting testimony missing witnesses would have provided).  As with the petitioner in Dows, Petitioner here submits no more than his own statements in his petition; he provides no affidavit from any of his purported defense witnesses, or any other evidence showing the testimony they would have given.  Nor does Petitioner provide any evidence demonstrating any such witness was

available to testify at trial.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

b

Petitioner claims counsel Delgado refused to pose a list of questions, prepared by Petitioner, to witnesses.  Doc. 1-2 at 8.

At the outset, the Court notes Petitioner has offered only his own conclusory statements and fails to provide a factual showing that his lawyer in fact failed to pose the purported questions.  He does not, for example, provide the proposed questions and show how they compare to what actually happened at the preliminary hearing. Petitioner thus fails to show ineffectiveness on the part of defense counsel.  See United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (holding petitioner must make sufficient factual showing to substantiate ineffective assistance of counsel claim).

Further, Petitioner does not explain to which witnesses the questions were relevant or explain what he sought to gain, let alone provide any evidence showing what testimony the witnesses would have given.  Petitioner's mere speculation that preliminary hearing witnesses would have given helpful testimony does not establish ineffective assistance.  See Bragg, supra.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

c

Petitioner claims counsel Delgado should have moved to suppress victim Garcia's and victim Hernandez's respective

10

identifications of him.  Doc. 1-1 at 3; Doc. 1-2 at 9-13.

The Court notes that neither Garcia nor Hernandez testified at the preliminary hearing.  The Court therefore understands Petitioner to be claiming that counsel should have moved to preclude the testifying officer's recount of their identifications.  See CT 13, 20.  For the reasons discussed below, counsel Delgado could have reasonably concluded that such a motion would be denied and thus futile.  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) (failure to make a futile motion does not constitute ineffective assistance of counsel).

i

The Court will first address victim Garcia's and victim Hernandez's respective identifications of Petitioner.  Although neither Garcia nor Hernandez testified at the preliminary hearing, the Court cites to their trial testimony to provide the details of the identification procedures.  Also, this trial testimony provides necessary background to Petitioner's additional claim — addressed below — that trial counsel rendered ineffective assistance in failing to move to suppress the identifications.

Victim Garcia's Identification:  At about 12:45 a.m. on the morning of the offenses, victim Anthony Garcia awoke to hear someone trying to open his front door.  Reporter's Transcript (RT) 830-31, 837-38.  As Garcia approached the front door he heard the doorknob moving, so he pulled the window blind open.  RT 831.  He saw Petitioner sitting in one of Garcia's rocking chairs on Garcia's front porch.  RT 831, 837-38, 840-41.  Although it was night,

11

Garcia's porch is lit by a floodlight that remains on all night. RT 831.  Garcia did not know Petitioner, but had "seen him in the neighborhood" before.  RT 831-32; see RT 833, 835-36.  Garcia noticed that Petitioner was wearing a white hooded sweater and had "a billy club or some kind of black-something" inside of his sweater.  RT 833-34, 840; see RT 835.  Garcia looked at Petitioner's face for about thirty seconds.  RT 841.  Garcia described the distance between Petitioner and the window as about eight and a half feet.  RT 832-33.  Garcia does not wear corrective lenses, and had not consumed any alcohol that evening/night.  RT 842.

Petitioner gestured to Garcia for the latter to come outside, but Garcia declined the invitation and told his fiancé to call the police.  RT 832-33, 838.  Petitioner then "really started pounding on the door," so Garcia went "to find a bat or something in case he was going to come through the door."  RT 832; see RT 833, 838.  Garcia then heard his car alarm going off and "bashing and smashing."  RT 834, 838-39. He ran back to the (same) window and saw Petitioner "hitting my car with whatever he had in his sweater." RT 834; see RT 834-35, 840; CT 5.  The car was parked in the driveway in front of Garcia's residence.  CT 5; RT 756.  Garcia watched Petitioner for about thirty seconds, albeit with Petitioner's back towards Garcia.  RT 841-42.

According to Garcia, the police "came right over," and knocked on his door.  RT 835; see RT 839; CT 4.  Garcia related the incident to police.  CT 4-5.  Shortly after, police took Garcia about six houses away, where Petitioner had been detained.  RT

12

764-65, 772, 782; see RT 795.  An officer walked Petitioner over to Garcia and asked Garcia whether Petitioner was the person Garcia had seen on his front porch.  RT 765, 773.  Garcia was told beforehand that the individual — Petitioner — may or may not be the person involved.  CT 13.  As it was dark, there were two spotlights on Petitioner.  RT 765, 773.  Garcia identified Petitioner with complete certainty.  CT 13; RT 765, 774-76; see RT 835.  Garcia was unable to identify Petitioner in the courtroom at trial.  RT 835.

        Victim Hernandez's Identification:  At about 12:55 a.m. on the day of the offenses, Nicacio Hernandez was sitting at the dining table in the living room of his house, watching television.  CT 19, 21; RT 711-12, 718-20; Doc. 1-2 at 35, 38.  His friend was asleep on the couch, nearby.  RT 712, 719.  Hernandez heard a knock on the front door, and then heard the door open.  CT 19, 21; RT 712, 719; Doc. 1-2 at 35, 38.  Hernandez turned around and saw Petitioner, whom he had never seen before.  CT 19, 21; RT 712-13, 719-20, 723; Doc. 1-2 at 35, 38.  Petitioner was about ten feet away from Hernandez. RT 719-20.  Petitioner had a "baseball bat" on his shoulder.  CT 19, 21; RT 713; Doc. 1-2 at 35, 38-39; see RT 717-18, 722.  Hernandez told police "it wasn't a typical baseball bat."  CT 21.  He said it was a "long, cylindrical wooden pole about four feet long, and about three inches in diameter."  Id.

        Hernandez asked Petitioner who he was, but Petitioner only replied, "Shut up."  RT 713.  About three minutes after Petitioner had entered the house, Hernandez "tried to turn over to where my friend was sleeping and as I turned that's when I felt the blow"

13

to the back of his head.  RT 713-14, 722-23; Doc. 1-2 at 35, 39; see
CT 21.  Hernandez fell to the floor.  RT 714-15, 723; Doc. 1-2 at
39.  He got back up and looked at Petitioner, who was then looking
around in the kitchen.  CT 22; RT 714-15, 723.  Petitioner grabbed a
knife and threw it at Hernandez and his friend, who were in the
living room.  RT 714-16, 723-24; see RT 725.  Asked at trial whether
he got a "good look at his face," Hernandez responded, "Well, he
didn't give me a chance to really get a good look at him, but, yes,
I did remember."  RT 729-30.

Hernandez and his friend escaped to a bedroom and closed
the door.  CT 22; RT 714-15, 724-25; Doc. 1-2 at 35.  Hernandez used
a cell phone to call the police.  RT 724; see RT 716.  Approximately
five minutes after going into the room, Hernandez and his friend
came back out.  RT 724-25.  Petitioner had left the house.  RT 725.
Hernandez was still talking to dispatch, who told him that police
had apprehended someone nearby.  RT 726-27; Doc. 1-2 at 39; see RT
716, 725.  At the direction of dispatch, Hernandez walked outside,
where he saw police, and motioned for them.  RT 727.  Police
questioned Hernandez.  Id.  "About two minutes later then I saw at a
distance that they were bringing this guy over and he was moving
around like dancing or something like that, like mocking the
police."  RT 727-28.  Officers were escorting Petitioner toward a
police car.  CT 19; RT 820-21.  The street, and specifically
Petitioner's face, was "pretty illuminated" by "ambient street
lighting" and the lights and spotlights from multiple police cars.
RT 825-26.  Hernandez spontaneously told police, "That's the guy.

14

You guys got the right guy.  That's the guy."  RT 822; <u>see</u> CT 20; RT 717, 727-29, 824-25, 828.

An officer then admonished Hernandez that "even though we have someone detained in handcuffs doesn't necessarily make them a suspect," that "they need to keep an open mind and view that person as without [sic] a bias and to be a hundred percent sure that this is the suspect before they make a positive identification."  RT 821; <u>see</u> RT 826.  Then, the officers conducted "an official show-up where we had the suspect stand next to a patrol vehicle, we put a spotlight — illuminated him with a spotlight, and had the victim stand approximately fifteen to twenty feet away."  RT 822. Hernandez identified Petitioner as his assailant, with certainty. CT 20; RT 716-17, 729, 822-23, 826-29; Doc. 1-2 at 36, 39-40. Hernandez also identified the billy club found by police as the weapon Petitioner had used.  CT 22; Doc. 1-2 at 36.

Hernandez was unable to identify Petitioner at trial, although he acknowledged that his memory was better on the night of the offense.  RT 717.  He had not consumed any alcohol the night of the assault.  RT 730.

ii

Due process may require suppression of eyewitness identification evidence where the identification procedure used was suggestive and unnecessary.  <u>Perry v. New Hampshire</u>, 132 S. Ct. 716, 718 (2012); <u>Manson v. Brathwaite</u>, 432 U.S. 98, 107-09 (1977); <u>Neil v. Biggers</u>, 409 U.S. 188, 196-98 (1972).  However, improper state conduct in arranging unnecessarily suggestive pretrial

15

identification procedures alone does not require exclusion of in-court identification testimony; the reliability of the eyewitness testimony is the "linchpin" in determining its admissibility. Manson, 432 U.S. at 100-14; see United States v. Drake, 543 F.3d 1080, 1089 (9th Cir. 2008).  Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986).

        In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness's opportunity to view the defendant at the time of the incident; (2) the witness's degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  Manson, 432 U.S. at 114.

        Here, under the totality of the circumstances, the admission of the identifications did not violate due process. Regarding the suggestiveness of the procedures, the one-on-one in-field show-up is a legitimate procedure to obtain an out-of-court identification.  United States v. Bagley, 772 F.2d 482, 492-93 (9th Cir. 1985).  Moreover, "[t]he use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for

16

the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses." United States v. Kessler, 692 F.2d 584, 586 (9th Cir. 1982); see id. at 585-86 (show-up in which witnesses were confronted with handcuffed suspect not impermissibly suggestive); see also United States v. Jones, 84 F.3d 1206, 1209-10 (9th Cir. 1996) (drive-by identification in which defendant was the only civilian surrounded by police officers was suggestive, but not impermissibly so), cert. denied, 519 U.S. 973 (1996); Bagley, 772 F.2d at 493 (post-arrest show-up in which witness saw defendant handcuffed and surrounded by police officers not impermissibly suggestive).

Regarding reliability, all of the indicia of reliability weigh in favor of admitting the identifications.  First, both victims had a good opportunity to view Petitioner at the time of the offenses.  Garcia viewed Petitioner through his window as Petitioner sat rocking on Garcia's lit porch.  RT 831, 837-38, 840-41. Petitioner was about eight and a half feet away from Garcia.  RT 832-33.  Garcia looked at Petitioner's face for about thirty seconds.  RT 841.  Garcia does not wear corrective lenses and had not consumed any alcohol that evening/night.  RT 842.

Victim Hernandez similarly had sufficient opportunity to view Petitioner.  Hernandez saw Petitioner from about ten feet away, inside Hernandez's home.  CT 19, 21; RT 712-13, 719-20, 723; Doc. 1-2 at 35, 38.  Hernandez viewed Petitioner again after Petitioner hit Hernandez in the head, as Petitioner was rummaging around in the kitchen.  CT 22; RT 714-15, 723.  Although at trial Hernandez said

17

that Petitioner "didn't give me a chance to really get a good look at him," Hernandez nonetheless confirmed, "yes, I did remember" Petitioner.  RT 729-30.

Second, the witnesses' degree of attention was good. Neither victim was under duress when they viewed Petitioner.  Garcia watched Petitioner through his window, viewing Petitioner's face for about thirty seconds.  RT 831-33, 837-38, 840-41.  He acknowledged recognizing Petitioner from the neighborhood.  RT 831-32; see RT 833, 835-36.  Hernandez watched Petitioner in Hernandez's own home, and was presumably focused on Petitioner as Petitioner was a stranger and had entered Hernandez's house uninvited.  See CT 19, 21; RT 712-13, 719-20, 723; Doc. 1-2 at 35, 38.  Hernandez also talked to Petitioner, asking him who he was.  RT 713. Although Hernandez was understandably under duress after Petitioner hit him, Hernandez had an ample viewing of Petitioner before that occurred.

Third, the witnesses' prior descriptions of the perpetrator were sufficiently accurate.  Victim Garcia described the perpetrator to police as a "kind of stocky," light-skinned male with a shaved head and a goatee.  CT 4-5; RT 755, 835; cf. RT 757 (told police "light-skinned possibly Hispanic man with a goatee").  Garcia testified Petitioner was wearing a "white hooded sweater" and appeared to be under the influence of something.  RT 833-34, 840-41. At trial, Garcia testified the perpetrator "looked Caucasian."  RT 835.  The record reflects Petitioner is light-skinned and Hispanic. See CT 221, 228, 230, 232.  Garcia also noted that he had frequently seen Petitioner walk by Garcia's house with Petitioner's "wife" and

18

a newborn.  RT 835.  At the time of the offenses, Petitioner did in fact live nearby with a baby and the baby's mother, Basilia Martinez.  CT 430; RT 865.

Victim Hernandez described the perpetrator as bald with a "light complexion."  RT 720.  Hernandez testified that the perpetrator wore a white "sweatband or scarf" covering his forehead. RT 720-21.  Asked at trial what the perpetrator was wearing, Hernandez stated, "I think he was wearing a t-shirt or something," but did not recall whether it was short-sleeved or not.  RT 721-22. Hernandez said the perpetrator was "somewhat tall, not too tall" and "a little husky."  RT 721.  Hernandez also described the perpetrator as appearing to be under the influence of something, swaying from side to side.  See RT 722-23, 727-28.

Officer Nuno Ribeiro, one of the arresting officers, described Petitioner, at the time of the show-ups, as having "a white, like a make-shift bandanna that was tied around his head.  It looked like it was torn from either a towel or a t-shirt.  I think he had a white t-shirt on and blue jeans.  And he was sweating profusely."  RT 823; see RT 827.  A booking photograph from Petitioner's arrest shows him with a bald head and goatee and describes him as 5'10" and 180 lbs.  CT 230; see CT 228; see also CT 232 (rap sheet physical description); RT 763, 767-77 (officer Gorshe describing Petitioner at arrest as looking strung out and sweaty, with a shaved head and goatee).

The witnesses' descriptions of Petitioner were sufficiently, even if not exactly, accurate as to both his

appearance and his clothing.  Further, both victims described Petitioner as being armed with a billy club, and a billy club was found in Petitioner's immediate presence when he was apprehended. Both victims also testified that Petitioner appeared to be under the influence of something, and indeed he was.  The witness descriptions do not indicate an untrustworthy identification procedure.

Fourth, both Garcia and Hernandez identified Petitioner with complete certainty at their respective show-ups.  CT 13, 20; RT 716-17, 729, 765, 774-76, 822-23, 826-29; Doc. 1-2 at 36, 39-40. Hernandez also identified the billy club used by Petitioner.  CT 22; Doc. 1-2 at 36.  That neither victim could identify Petitioner at trial does not invalidate the propriety of the show-up procedure, and only favored Petitioner.

Last, the length of time between the crime and the identifications was de minimus.  Garcia and Hernandez each identified Petitioner within minutes of the offenses against them. See CT 4-5, 19-20; RT 716-17, 725-29, 764-65, 772-73, 782, 795, 820-29, 835, 839; Doc. 1-2 at 36, 39-40.

In light of these factors, Petitioner's preliminary hearing counsel and trial counsel could have reasonably believed that the identification procedure was not unlawful and therefore that any motion to suppress the identifications would be futile. For the same reasons, the state court could have reasonably concluded that counsel did not render ineffective assistance.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**d**

Petitioner claims counsel Delgado "tampered" with victim witness Hernandez.  Doc. 1-1 at 3.  Specifically, Petitioner claims that Delgado "sent her investigator," David Lucio, to get Hernandez to "change his story."  Doc. 1-1 at 3-4.  Petitioner relies on a comparison of Lucio's notes from his interview of Hernandez and the police reports following the attack on Hernandez and argues there is a "big difference" in how Hernandez reported the extent of his head injuries.  See id.

The Court has reviewed the interview notes and police reports provided by Petitioner.  See Doc. 1-2 at 35-40.  Both reflect Hernandez's self-reporting that he was struck in the back of his head and suffered pain and swelling as a result.  See id.  Although Lucio took a more thorough report of the crime and injuries, this is not evidence of any wrongdoing, let alone witness tampering.  To the extent Petitioner is claiming that Lucio asked too many questions about Hernandez's injury, his suspicions are misplaced.  It was reasonable to investigate the extent of Hernandez's injuries to determine, among other things, whether Hernandez's recollection of the crime or perception of the perpetrator may have been affected, allowing for impeachment of any testimony he might give.

Further, Hernandez did not testify at the preliminary hearing, and testified only minimally about his head injury at trial.  See RT 722-23, 731.  Indeed, it was in the prosecutor's interest to minimize any lasting injury and thereby counter any

21

suggestion that Hernandez's recollection or perception were impaired.  See RT 731.  There was no enhancement alleged for great bodily injury, so the extent of Hernandez's head injury was never directly in issue.

Petitioner asserts Hernandez had previously indicated that he did not want to "be there in court," and thus that Delgado must have somehow persuaded him to testify for the prosecution.  Doc. 1-1 at 3.  Again, Petitioner has offered only his own conclusory statements and fails to provide a factual showing that Hernandez did not want to testify.  There is no suggestion in the record that Hernandez was uncooperative.  In any event, Hernandez was presumably subpoenaed by the prosecutor and had no decision in the matter.  There is no evidence that Delgado had anything to do with Hernandez's presence at trial.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

2

Further, the Court finds no prejudice.  To reiterate, Petitioner alleges ineffective representation at the preliminary hearing.  The prosecutor's burden of proof at that hearing was not reasonable doubt, but instead only "probable cause" to believe a charged crime has been committed.  Cooley v. Superior Court, 29 Cal. 4th 228, 250 (2002).  Stated otherwise, the trial court had only to determine "whether a reasonable person could harbor a strong suspicion of the defendant's guilt, i.e., whether such a person could reasonably weigh the evidence, resolve conflicts, and give or

22

withhold credence to particular witnesses in favor of harboring such a suspicion." Id. at 251-52; accord Roman v. Superior Court, 113 Cal. App. 4th 27, 32 (2003).  Considering the strength of the evidence against Petitioner and the low burden of proof at the preliminary hearing, there is no reasonable probability that, but for counsel Delgado's alleged errors, the result of the preliminary hearing would have been different.

**B**

Petitioner also raises several claims of ineffective assistance of his court-appointed trial counsel, Kipp Davis. Applying the principles above regarding the legal standard for ineffective assistance of counsel, the Court addresses Petitioner's claims.

**1**

**a**

Petitioner claims trial counsel should have impeached prosecution witness Susan Crisham "with felony convictions."  Doc. 1-1 at 12; Doc. 1-2 at 26.

Crisham was victim Anthony Garcia's fiancé and lived with him at the time of the offenses.  See RT 843-44.  She was the registered owner of the car Petitioner vandalized.  RT 844-45.  She testified chiefly about the damage to her car.  See RT 844-46.

First, Petitioner submits no evidence showing Crisham had ever been convicted of a felony, or that even if she had, such felony was admissible for impeachment purposes under California law. See Doc. 1-1 at 12; Doc. 1-2 at 26.  Regardless, as noted, Crisham's

23

testimony was not critical.  Garcia, not Crisham, was the chief witness to Petitioner's offense at Crisham and Garcia's residence. Crisham in essence testified on undisputed issues: that her car was damaged, and that the damage amounted to $995.22, which amount she backed up with a receipt.  See RT 843-46.  Even assuming, arguendo, that Crisham had an admissible felony conviction, counsel could have reasonably concluded that impeaching Chrisham was not worthwhile.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

b

Petitioner claims trial counsel should have objected to three pieces of physical evidence introduced at trial.  Doc. 1-1 at 9-10.

Specifically, Petitioner claims trial counsel should have objected to the introduction of the following items: a "picture of defendant with a friend who has – Nazi – tattoos all over his face, neck, head, and body"; "a letter addressed to defendant concerning a domestic violence case, which does not make clear if defendant was the victim or the suspect (defendant was the victim)"; a letter from the law offices of Friedland, Rivas, and Associates . . .; this was not defendant's letter but rather his son's letter (Edward Gutierrez, Jr.)."  Doc. 1-1 at 9-10.  Although the items Petitioner describes are not described in the record as such, the Court assumes he refers to the prosecutor's trial exhibit 13, which was described at trial as "several items that were contained in an envelope, one

24

of which is a letter addressed to the defendant at the 977 Pacific Avenue.  Another is a receipt with the defendant's name on it.  The third item is a letter addressed to the defendant at the same address.  [¶]  And then there are two four-by-six photographs depicting a person that appears to be the defendant in each photograph."  RT 802; see RT 804.  Investigating Sergeant Ken Binder testified that the above items "were in a drawer that was in the kitchen of the residence, the apartment number 'D,' in the drawer to the left of the south end of the sink."  RT 803.

Petitioner asserts the evidence was admitted in violation of California Evidence Code section 352, which permits the exclusion of evidence if its probative value is outweighed by concerns of undue prejudice, confusing of the issues, or misleading the jury.  See Doc. 1-1 at 9.  Hence, Petitioner does not dispute the evidence was relevant, but rather asserts that it was unduly prejudicial.  See id.

Nothing in the record indicates why trial counsel did not object to the evidence, but the reasoning is apparent.  An objection would have been futile.  The items established that Petitioner resided at apartment D.  Establishing Petitioner's residence was relevant because the stolen camera was found there, and because of the location of the residence, specifically its proximity to the victims' residences.

The evidence also was necessary.  Petitioner did not testify at trial and does not suggest that at any time before trial he offered to stipulate that he lived at the residence.  Although

his girlfriend testified Petitioner lived with her, she was less than firm — "I believe so" (RT 866) — and regardless did so during the defense case, i.e., after the prosecution had to introduce its evidence.  In short, establishing Petitioner's residence in apartment D was relevant and necessary.

As for prejudice, none is reflected in the record. Assuming, arguendo, the introduced photo of Petitioner showed him with a friend with Nazi tattoos, any prejudice by association was surely minimal.  As Petitioner describes it, the photo was an image containing both Petitioner and a friend bearing Nazi tattoos.  See Doc. 1-1 at 9.  Even from such a photo, Petitioner, who is Hispanic, would not be presumed to be a Nazi skinhead.  Counsel could have reasonably determined the picture would not have been suppressed under California Evidence Code section 352 in light of its relevance.

The next challenged item, a letter to Petitioner concerning a domestic violence case, is woefully under-described. See Doc. 1-1 at 9-10.  Petitioner claims it was not clear whether he was the victim or the perpetrator, but lacking a description of the letter there is no showing of prejudice.  Regardless, Petitioner was not on trial for domestic violence, nor did his girlfriend testify he had ever been violent toward her; the letter did not touch on any issue implicated in the case.  On the face of Petitioner's description, the potential for prejudicial effect was minimal.  As with the photo, supra, counsel could have concluded the letter would not have been suppressed.

26

1    Last, Petitioner makes no attempt to explain how a letter
2    to or from him or his son to a law firm held any prejudice at all.
3    Petitioner's conclusory claim of prejudice is not enough to show
4    that counsel's performance fell below an objective standard of
5    reasonableness.  See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir.
6    1990) (petitioner has burden of showing that counsel's performance
7    was deficient); see also Jones v. Gomez, 66 F.3d 199, 205 (9th Cir.
8    1995) (conclusory allegations of ineffective assistance of counsel
9    do not warrant federal habeas relief).

10    Accordingly, Petitioner is not entitled to habeas relief
11    on this claim.

12                                   c

13    Petitioner claims trial counsel should have called as a
14    witness and cross-examined the technician who drew Petitioner's
15    blood on the night of the arrest.  Doc. 1-1 at 16.  Petitioner also
16    claims trial counsel should have called as a witness and
17    cross-examined the physician who examined victim Nicacio Hernandez.
18    Doc. 1-1 at 16-17.

19    Once again, Petitioner does not explain to which issues
20    these witnesses were relevant or explain what he sought to gain, let
21    alone provide any evidence showing what testimony the witnesses
22    would have given or that they were available to testify.
23    Petitioner's mere speculation that the witnesses would have given
24    helpful testimony does not establish ineffective assistance.  See
25    Bragg, supra.

26    Accordingly, Petitioner is not entitled to habeas relief
27
28                                  27

on this claim.

d

Petitioner claims his trial counsel told him "he would let him get found 'guilty' if defendant did not plead guilty."  Doc. 1-1 at 5.  Petitioner also asserts that during a hearing on one of Petitioner's many Marsden motions to replace counsel, trial counsel acknowledged he did "push" Petitioner.  Doc. 1-1 at 5-6.

People v. Marsden, 2 Cal. 3d 118 (1970), requires the state trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.  Petitioner raised this claim, though not the identical accusation, in a Marsden motion heard January 16, 2008.  The issue was revisited briefly in Marsden hearings heard on April 9 and 28, 2008.  Respondent has filed under seal a copy of the transcripts from the Marsden hearings.

The Court has reviewed these transcripts and finds that Petitioner's recitation of the state trial court proceedings is incorrect.  A review of the record shows that, contrary to Petitioner's suggestion, counsel did not acknowledge telling Petitioner or suggesting to him that he would allow Petitioner to be convicted if Petitioner did not enter a plea.  Rather, counsel explained at length that he had discussed with Petitioner the benefits, under the circumstances, of entering a plea, and that he believed proceeding to trial was a bad idea.  RT of Jan. 16, 2008, at 324-25, 329; RT of April 9, 2008, at 615-16; RT of April 28, 2008, at 649-50.  Counsel acknowledged urging Petitioner to consider

28

a plea, but also made very clear he was willing and prepared to try the case to the best of his abilities.  <u>See</u> RT of Jan. 16, 2008, at 324-26, 329; RT of April 9, 2008, at 615-16; RT of April 28, 2008, at 649-50.  Counsel's opinions on the tactical options, including urging Petitioner to enter a plea, did not fall below an objective standard of reasonableness.

        Regardless of what counsel said to Petitioner, Petitioner did not plead guilty, and so plainly was not coerced in that direction.  To the extent Petitioner claims that trial counsel "let him get found 'guilty,'" Doc. 1-1 at 6, Petitioner fails to identify specific material failings of trial counsel under <u>Strickland</u> and therefore fails to establish ineffectiveness.  <u>See</u> <u>Toomey</u>, 898 F.2d at 743; <u>Jones</u>, 66 F.3d at 205.  Petitioner's specific grounds for relief as raised elsewhere in his petition are addressed elsewhere in this Order.

        Accordingly, Petitioner is not entitled to habeas relief on this claim.

                                        e

        Petitioner claims various witnesses "lied" at trial and that trial counsel failed to impeach such witnesses accordingly.  Doc. 1-1 at 13.

                                        i

        Petitioner asserts Deputy Gorshe lied when Gorshe testified that victim Anthony Garcia, upon identifying Petitioner, was "one hundred percent" certain petitioner was the perpetrator.  Doc. 1-1 at 13.  Deputy Gorshe did so testify, on direct

examination. RT 765.  On cross examination, when asked whether the "one hundred percent" description were his words or Garcia's words, Deputy Gorshe indicated that, in practice, he would ask a witness for a percentage of certainty, and so the words must have been Garcia's. <u>See</u> RT 774-75.  Trial counsel then showed Deputy Gorshe his preliminary hearing testimony, wherein Gorshe had said the "one hundred percent" description was Gorshe's words, not Garcia's.  CT 13-14; RT 775-76. Gorshe acknowledged he had so testified at the preliminary hearing.  RT 776.

Petitioner shows nothing more than a prior inconsistent statement by Deputy Gorshe, and that he was impeached with such inconsistency by Petitioner's trial counsel.  <u>See</u> RT 775-76. Garcia himself testified about the identification.  RT 835. Moreover, there was no dispute about Garcia's certainty, regardless of how it was described.  Petitioner shows nothing improper in Deputy Gorshe's testimony.

Petitioner next asserts Deputy Gorshe lied in his description of Petitioner's billy club.  Doc. 1-1 at 13.  Petitioner bases this claim on the fact that the billy club was described in various ways by other witnesses.  <u>See</u> Doc. 1-1 at 13; RT 761-63.  Nothing in the record shows that Deputy Gorshe lied about the billy club.  Petitioner shows no inconsistency in Deputy Gorshe's testimony, nor even a material inconsistency in the various witnesses' testimony.  <u>See</u> Doc. 1-1 at 13.  There was nothing, in other words, with which trial counsel could impeach Deputy Gorshe. The billy club was admitted into evidence, so the jury could assess

each witness' description of it.   RT 762-63.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

ii

Petitioner claims Santa Clara County Sheriff's Sergeant Nuno Ribeiro lied when Ribeiro testified that victim Nicacio Hernandez, upon identifying Petitioner, indicated he was "a hundred and ten percent [sure]" that the perpetrator was Petitioner.   Doc. 1-1 at 13; RT 823, 826-27.   The record shows that trial counsel pointed out to Sergeant Ribeiro that the latter had testified at the preliminary hearing that Hernandez was only "a hundred percent sure" Petitioner was the perpetrator.   RT 828.   When pressed whether the additional ten percent was Hernandez's description or Ribeiro's description, Ribeiro testified he could not recall.   RT 828-29.

As with Deputy Gorshe, discussed above, Petitioner fails to show a lie or that it was not handled by trial counsel.   That is, Petitioner has demonstrated only an inconsistency in Sergeant Ribeiro's testimony, neither version of which is helpful to Petitioner.   Further, trial counsel pointed out the inconsistency. That Hernandez was certain also was not seriously contested.

Petitioner next asserts Sergeant Ribeiro lied about where Ribeiro was standing when Petitioner was "brought out of the back yard to [the] sidewalk."   Doc. 1-1 at 13.   At the preliminary hearing, Sergeant Ribeiro testified that as he was speaking with Hernandez, the latter looked over and saw Petitioner being led out from behind a house and spontaneously identified him.   CT 20.

31

Sergeant Ribeiro was never asked specifically where he was in location to Hernandez and, contrary to Petitioner's suggestion (Doc. 1-1 at 13 ("75 feet")), was never asked how far away he and Hernandez were from Petitioner.  <u>See</u> CT 17-23.  At trial, Sergeant Ribeiro testified in the same way: He was speaking with Hernandez when the latter saw Petitioner being led out, and identified him. RT 822.  When asked how far Petitioner was from Hernandez when Hernandez first identified him, Sergeant Ribeiro stated, "About fifteen to twenty yards."  RT 824.  As for Petitioner's claim that Sergeant Ribeiro testified he was only two feet from Petitioner when Hernandez identified him (Doc. 1-1 at 13), he offers no record citation, and the Court finds no such testimony in the record.  <u>See</u> RT 820-29.  In sum, there is no inconsistency in Sergeant Ribeiro's testimony.  Regardless, Petitioner fails to explain the significance of such a discrepancy, even if it existed.

Petitioner next asserts Sergeant Ribeiro lied about giving Hernandez an admonishment before Hernandez identified Petitioner. Doc. 1-1 at 14.  Petitioner alleges nothing more, however, than an inconsistency between Sergeant Ribeiro's testimony and that of Hernandez.  <u>See</u> <u>id.</u>  Moreover, there is in fact no inconsistency: Hernandez was never asked whether he was admonished at any time. <u>See</u> RT 710-32.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

//

//

32

### iii

Petitioner claims one of the victims, Nicasio Hernandez, lied on the stand about what, precisely, Petitioner was wearing on his head at the time of the offense.  Doc. 1-1 at 14.  Petitioner asserts he was wearing a "shirt sleeve on his head," Doc. 1-1 at 14, but points out that Hernandez described the item (through an interpreter) as "something white on [Petitioner's] head like the one that play games."  RT 720.  Asked, "Sort of like a sweatband or a scarf tied on your head?" Hernandez responded, "I think so because it's one of those things that you wear on your head."  RT 720.

Petitioner fails to show an impropriety on the part of Hernandez or trial counsel.  The record reflects Hernandez simply tried to describe what Petitioner wore on his head, even if he lacked a specific term for it; Petitioner apparently does not dispute the item was white and went around his head.  See RT 720; Doc. 1-1 at 14.  Even assuming, arguendo, Hernandez was inaccurate in describing Petitioner's headwear, Petitioner fails to explain the significance.  Hernandez had no motive to lie about the specifics of what Petitioner wore on his head, and, for the same reason, the point was irrelevant.

Petitioner also claims Hernandez lied at trial about "falling forward to the floor from a blow to his head."  Doc. 1-1 at 4; see RT 714, 723-24; Doc. 1-2 at 39.  Petitioner believes Hernandez perjured himself because "in trial [Hernandez] stated he was seated at a table so he could not have fallen forward to the floor."  Doc. 1-1 at 4; see RT 720.  Strictly speaking, Hernandez

did not testify about falling "forward," but simply that he fell to the floor upon being hit.  RT 714, 723-24.  This he presumably could have done by falling to the side, or by falling into the table and then to the side, or otherwise.  The point is, there is not necessarily any inconsistency within Hernandez's statements and testimony.  Further, there is no point to the inconsistency Petitioner attempts to tease out of Hernandez's statements.  The issue was whether Hernandez was hit at all, a point Petitioner does not dispute.  Trial counsel was reasonable in deciding not to attempt to cross-examine on irrelevant points.

Next, Petitioner asserts Hernandez lied when he testified Petitioner threw a knife at Hernandez.  Doc. 1-1 at 4; see RT 714-15, 723-25.  Although the Court finds no reference to the thrown knife in the police report Petitioner provides, Doc. 1-2 at 35-36, Hernandez did tell a defense investigator that Petitioner had thrown a knife at him as Hernandez fled to a back room.  Doc. 1-2 at 39. At trial, Hernandez's testimony was consistent, though when pressed he acknowledged he did not know or could not remember whether he personally had seen the knife thrown, or whether his roommate had simply told him about it.  See RT 714-15, 723-25.  As with Petitioner's other perceived "lies," Petitioner shows nothing more than an arguable inconsistency in Hernandez's testimony.  As for trial counsel's response, it was trial counsel who pressed Hernandez to acknowledge he could not remember whether he had seen the event or been told about it because he had already gone into a back room. See RT 723-25.  There was no other ground of significant impeachment

in Hernandez's testimony on the point.  There likewise is no showing of any "lie" by Hernandez.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**f**

Petitioner claims trial counsel was ineffective for failing to challenge one or more of his prior strike convictions. Doc. 1-1 at 20.

Petitioner was alleged to have three prior strikes: a 1976 juvenile adjudication for robbery (CT 147, 204-07), a 1983 robbery conviction (CT 147, 199), and a 1988 robbery conviction (CT 146, 178).  See Cal. Penal Code § 1170.12(b).  The 1983 and 1988 robbery priors were also alleged as prior serious felonies.  CT 147; see Cal. Penal Code § 667(a).  At sentencing, the trial court struck the strike enhancement findings as to the 1976 and 1983 priors.  RT 1040.  Thus, the trial court utilized only the 1988 robbery prior as a strike, and the 1983 and 1988 priors as prior serious felonies. RT 1040-41.

Petitioner first challenges the use of his 1983 robbery conviction as a prior serious felony enhancement under California Penal Code section 667(a).  Doc. 1-1 at 20.  He argues the robbery may not serve as a prior under section 667(a) because it did not involve "force."  CT 202; Doc. 1-1 at 20; see Cal. Penal Code § 211 (defining robbery as requiring "force or fear").  Under state law, however, robbery is one of the crimes specifically listed in section 1192.7 as a "serious felony" for purposes of a section 667(a)

35

enhancement.  <u>See</u> Cal. Penal Code §§ 667(a)(4), 1192.7(c)(19).
Although Petitioner asserts that the parties (in 1983) agreed the
conviction would not be used under section 667(a), nothing in the
record supports such a claim.  Doc. 1-1 at 20; <u>see</u> CT 202.

Petitioner also contends his robbery convictions were not
strikes.  Doc. 1-1 at 20.  To the contrary, although only
Petitioner's 1988 robbery conviction is in issue, any robbery
conviction is a strike conviction under state law.  <u>See</u> Cal. Penal
Code §§ 211-213, 667.5(c)(9), 1170.12(b)(1), 1192.7(c)(19).  His
1988 robbery conviction thus was correctly used as a "strike."

Accordingly, Petitioner is not entitled to habeas relief
on this claim.

g

Petitioner claims the in-field identifications were
unconstitutionally suggestive and that trial counsel should have
moved to suppress them.  Doc. 1-1 at 11-12.  For the reasons
discussed above in connection with Petitioner's claim that
preliminary hearing counsel should have moved to suppress the
identifications, the Court finds trial counsel did not render
ineffective assistance for failing to move to suppress.

Accordingly, Petitioner is not entitled to habeas relief
on this claim.

2

Further, the Court finds no prejudice.  As discussed
above, sufficient admissible evidence, including the following,
pointed to Petitioner's guilt: (1) Petitioner was arrested near the

36

scene of the crimes just after the crimes were committed; (2) the two eyewitnesses identified him at the scene; (3) the billy club was found near Petitioner; (4) the camera stolen from one of the victims was found in Petitioner's apartment; and (5) the witnesses and responding officers all agreed that Petitioner was extremely intoxicated.   In view of the evidence against Petitioner, even if it is assumed that counsel's performance was deficient for the reasons alleged by Petitioner, there is no reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.

C

Petitioner alleges prosecutorial misconduct and a "violation of the chain of custody" concerning the camera he stole from one victim's house.  Doc. 1-1 at 6-7.  Specifically, he perceives an inconsistency in the officer's and victim's respective testimony concerning when the victim identified the camera as his.  Doc. 1-1 at 7-8.

On the night of the offenses, Santa Clara County Sheriff's Detective Ken Binder investigated the burglary of an apartment shared by Gerardo Mondragon and Juan Rosas.  CT 24-26; RT 792-96.  On the night of the offenses, Binder searched Petitioner's apartment.  CT 26-28; RT 796-97.  Inside Petitioner's apartment, Binder found a black backpack belonging to Petitioner.  RT 797-98.  Binder found, inter alia, a Kodak camera in the backpack.  CT 28; RT 798-804.  At trial, Juan Rosas, owner of the Kodak camera, testified through an interpreter.  RT 733, 737.  Asked about being shown the

camera, Rosas testified:

> Q. . . . . [¶] Do you remember in the days after the
> burglary an officer showing you a camera?
>
> A. Yes.
>
> Q. Was that the same camera that went missing from your
> house that night?
>
> A. Yes. It's the same one they took with them and he also
> asked me for the ticket when I bought it.
>
> Q. When you say "ticket" do you mean receipt?
>
> A. Yes.

RT 738.  At trial, Rosas identified the camera seized from

Petitioner's backpack as the one that was taken from his and

Mondragon's apartment.  RT 738-39.  On cross-examination, Rosas was

asked, inter alia, "[W]hen did you discover that your camera was

missing?"  RT 741.  Rosas answered, "When the police officer showed

it to me."  RT 741.

          As the Court understands him, Petitioner's claim of

prosecutorial misconduct and a violation of the chain of custody

stems entirely from what may be an inconsistency in Rosas's

testimony.  See Doc. 1-1 at 7-8.  Petitioner appears to assert there

is a discrepancy in the testimony concerning when police asked Rosas

to identify his camera.  Rosas at one point agrees that "in the days

after the burglary" police asked him whether he could identify the

camera (RT 738), yet also testified the camera was "the same one

they took with them" (RT 738), and that he realized the camera

was missing "when the police officer showed it to me" (RT 741).

Detective Binder was not asked when Rosas was asked to identify the

camera.

Petitioner fails to show a clear inconsistency in Rosas' testimony, much less anything stating a prima facie case of federal constitutional error caused by the prosecutor or investigating officers.  On one hand, each of Rosas's statements, taken at face value, could be correct.  Rosas could have been asked by police at the scene whether the camera belonged to him, and then asked to identify the camera again days later by another officer, for example, a district attorney investigator or sheriff's investigator. On the other hand, either the prosecutor or Rosas may have been inexact in their statements, and Rosas was only asked to identify the camera once, the timing of which is not clear.  Yet another plausible, innocuous explanation is that Rosas is a human with an imperfect memory, and/or his answer was made somewhat ambiguous through the interpreter.

Even assuming, however, some inconsistency in Rosas's testimony concerning when or how many times he was asked to identify the camera, Petitioner fails to show how it is relevant.  It is plain from the context of the questioning of Rosas that the point was whether, not when, he had identified the camera as his.  Even Petitioner's own witness, his girlfriend, did not dispute that the camera did not belong to her or Petitioner, and did not dispute that police found it in Petitioner's backpack.  See RT 870-75.  When or how many times police showed it to Rosas was entirely irrelevant.

Petitioner also fails to show how the alleged inconsistency in Rosas's testimony is chargeable to the prosecutor or the investigating officers.  Detective Binder did not

testify about the timing of Rosas's identification of the camera.

In summary, Petitioner fails to point to facts in the record supporting a prima facie case of any impropriety at all, let alone federal constitutional error by the prosecutor or investigating officers.  The state court could have reasonably rejected the claim for failure to state a claim.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

D

Petitioner claims his appellate counsel provided ineffective assistance.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant effective assistance of counsel on his first appeal.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland.  See Strickland, 466 U.S. at 668; Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner thus must show his counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Miller, 882 F.2d at 1434 & n.9.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a criminal defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  "[T]he weeding out of weaker issues is widely recognized as one of the hallmarks of

40

effective appellate advocacy."  <u>Miller</u>, 882 F.2d at 1434 (footnote omitted).  Consequently, where appellate counsel "decline[s] to raise a weak issue," he or she will "frequently remain above an objective standard of competence" and, for the same reason, will have caused his client no prejudice.  <u>Id.</u>

1

Petitioner claims his appellate counsel should have raised the issues discussed elsewhere in his petition that were not presented on direct appeal.  Doc. 1-1 at 7-8, 11, 14.  In the instant case, because none of the claims discussed herein are meritorious, any failure on the part of counsel to raise them on appeal was neither deficient assistance nor prejudicial to Petitioner.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

2

Petitioner claims that appellate counsel failed to communicate with him "on a reciprocative basis."  Doc. 1-1 at 17-18.

Petitioner fails to identify specific material failings of appellate counsel under <u>Strickland</u> and therefore fails to establish ineffectiveness.  <u>See</u> <u>Toomey</u>, 898 F.2d at 743; <u>Jones</u>, 66 F.3d at 205.  Petitioner also fails to show how he suffered prejudice from any such errors.  <u>See</u> <u>id.</u>

The Court also notes that, as evidence for this claim, Petitioner submits letters to him from counsel.  <u>See</u> Doc. 1-2 at 45-50.  In the letters, appellate counsel addressed the arguments that

41

Petitioner sought to raise on appeal and explained why they lacked merit.  See id.  The letters, rather than supporting Petitioner's argument that counsel did not communicate or consult with him, show the opposite.  They show that counsel seriously considered Petitioner's suggestions regarding investigating certain aspects of his case and wanted to keep an open line of communication between them.  The Supreme Court has held that, although the Sixth Amendment guarantees the right to competent counsel, it does not guarantee a meaningful relationship between an accused and his counsel.  Morris v. Slappy, 461 U.S. 1, 13-14 (1983).

Accordingly, Petitioner is not entitled to habeas relief on this claim.

3

Petitioner claims appellate counsel failed to file an "Anders brief" on various issues.  Doc. 1-1 at 15, 18.

In Anders v. California, 386 U.S. 738 (1967), the United States Supreme Court established certain safeguards to protect an indigent defendant's right to appellate counsel.  Petitioner apparently refers to the Anders requirement that, if counsel determines that an appeal would be "wholly frivolous," he must request leave to withdraw and file a brief identifying anything in the record that might arguably support an appeal.  See id. at 744.  That is, Petitioner appears to assert that appellate counsel should have filed a brief suggesting issues for the state appellate court to review independently, even if counsel himself did not intend to raise them.  See id.  Doc. 1-1 at 15, 18.  Appellate counsel is not

42

required to file a brief suggesting issues for independent review; that aspect of Anders is not constitutionally compelled and is not required under California's implementation of Anders, through People v. Wende, 25 Cal. 3d 436, 441-42 (1979).  See Smith v. Robbins, 528 U.S. 259, 272 (2000).  Further, an Anders or Wende brief is only implicated when counsel has no viable issue to raise on appeal; here appellate counsel raised an issue on appeal.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### E

Petitioner claims the trial court committed "judicial misconduct" by allowing trial counsel to continue to represent Petitioner after counsel purportedly admitted threatening him, and by refusing to hear one of Petitioner's Marsden motions.  Doc. 1-1 at 6, 15-16.

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  See In re Murchison, 349 U.S. 133, 136 (1955).  There are two general ways in which a defendant may establish that he was denied his constitutional right to a fair and impartial judge:  (1) the appearance of judicial bias or advocacy, or (2) the judge's pecuniary or personal interest in the outcome of the proceedings.  See Taylor v. Hayes, 418 U.S. 488, 501-04 (1974).  A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state

43

judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995).  A state judge's conduct must be significantly adverse to a defendant before it violates constitutional requirements of due process and warrants federal intervention.  <u>See</u> <u>Garcia v. Warden, Dannemora Corr. Facility</u>, 795 F.2d 5, 8 (2d Cir. 1986).  "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).

1

Petitioner claims his right to due process — not his right to counsel — was violated when the trial judge permitted trial counsel to continue to represent Petitioner after counsel admitted "pushing" Petitioner to accept a plea.  Doc. 1-1 at 5-6.

Petitioner's judicial misconduct claim is based on his disagreement with the trial judge's denial of his motion to substitute counsel.  But it is well established that judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  <u>See</u> <u>Liteky</u>, 510 U.S. at 555.  Petitioner sets forth no evidence that this was the rare case in which the judge "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible."  <u>Id.</u>  <u>Accord</u> <u>In Re Complaint of Judicial</u>

44

<u>Misconduct</u>, 715 F.3d 747, 749 (9th Cir. 2013) (standing alone, judge's dismissal of underlying case on the merits does not support claim of judicial misconduct); <u>Ortiz v. Stewart</u>, 149 F.3d 923, 939-40 (9th Cir. 1998) (post-conviction relief judge's evident disdain for petitioner's argument that several of his attorneys were ineffective for failing to discover each other's ineffectiveness simply reflected judge's frustration with the number of petitioners who attempted to manipulate the criminal justice system and did not amount to unconstitutional bias).

Further, as set forth above, Petitioner misrepresents the factual premise for this claim. A review of the record actually shows that counsel believed it was better strategy for Petitioner to enter a plea and hope for reduced sentencing — and urged Petitioner to consider a plea — but made clear he was prepared and willing to try the case. Regardless, whatever counsel stated to Petitioner, Petitioner has failed to show that counsel rendered ineffective assistance. For the same reason, Petitioner fails to show "judicial misconduct" in the denial of his <u>Marsden</u> motion.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

                                   2

Petitioner claims the trial judge committed judicial misconduct by refusing to hear one of his <u>Marsden</u> motions.

                                   i

On the morning of September 5, 2008, the date originally set for sentencing, the trial court addressed a <u>Marsden</u> motion filed

                                  45

by Petitioner.  Doc. 1-1 at 15-16.  This was Petitioner's seventh

Marsden motion in the case.  The transcript shows the following

colloquy:

> The Court: Also, Mr. Gutierrez, the last time we met you
> had brought another Marsden, I think this would be the
> seventh Marsden that you have filed, and in that
> particular one that was the one that was filed on June
> 10th, and what I did is I basically said it was
> unacceptable because you checked every single box.
>
> The Defendant: Yes.
>
> The Court: And I said that's not the way we can do it
> because since you've gone over and over and over as far as
> the Marsden goes, I need you to be more specific.  You
> needed to tell me what's going on here that's different
> from the other times.
>
> So you did file, or you didn't file, you sent me a letter
> including all of that, which I've read, I've considered,
> it's going to be filed and made part of the record.  And,
> Mr. Gutierrez, you do two things in that Marsden, first of
> all, you bring up a lot of issues that aren't Marsden-type
> issues, they have nothing to do with whether I should
> replace Mr. Davis as your attorney or not.  They have to
> do with whether you have appellate issues in your trial.
> And you will always have appellate issues in your trial.
> It's got nothing to do with this particular attorney.
>
> The other things that your raise, Mr. Gutierrez, are all
> things that not only have I heard before but other judges
> heard before, so I'm not going to hear your Marsden today.
>
> The Defendant: Um.
>
> The Court: I'll let you talk in just a moment but that's
> my decision, we're not going to do a Marsden hearing.
>
> The Defendant: Can I submit everything that was,
> everything that I put on Marsden motion, 995 motions or
> anything that I submitted in the paper, can I submit those
> as objections, personal objections so that they are not
> open to [sic]?
>
> The Court: If there's any appellate issue in those,
> certainly, in fact, everything that you've put on the
> record so far in all the other Marsdens that you've had
> plus what you just mailed to me, that's all part of the
> record.

46

The Defendant: Okay.

The Court: So when you do go to appeal – and in those <u>Marsden</u> papers, like I said, a lot of the information and the objections you had they don't go to whether or not Mr. Davis should be your attorney, they go to your appeal in the case – and you have those rights and those are perfected and at the next stage that will be where those things are taken up.

The Defendant: Yes, sir.  That's why I just wanted to submit them as objections so they are not open for waiver in the future.

The Court: You have done that.

The Defendant: Thank you.

RT 1011-13.

ii

Petitioner's claim fails for two reasons.  First, a review of the entire record shows that the trial court did not fail to hear Petitioner's <u>Marsden</u> motion.  Rather, the trial court made clear that it had read and considered the motion, but that the issues therein had been addressed in previous motions or had nothing to do with the replacement of counsel.  <u>See</u> RT 1011-13.  The court was effectively denying the motion for reasons already addressed at previous <u>Marsden</u> hearings.  <u>See</u> <u>id.</u>

Second, regardless of whether the state court failed to rule on the motion to substitute counsel or denied the motion, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated.  <u>Schell v. Witek</u>, 218 F.3d 1017, 1024-25 (9th Cir. 2000) (en banc) (overruling earlier circuit precedent that had stated that habeas court's inquiry was whether the state court's denial of the motion

47

was an abuse of discretion).  That is, the habeas court considers whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  <u>Id.</u> at 1026.  Here, Petitioner has not demonstrated ineffective representation of counsel in the context of this claim, or elsewhere in the petition, let alone ineffective representation that occurred specifically between the time he filed his sixth <u>Marsden</u> motion and the time he filed his seventh <u>Marsden</u> motion. Indeed, by the time Petitioner filed his seventh <u>Marsden</u> motion, the trial had concluded and counsel's only role was to represent Petitioner at sentencing.  Counsel did so effectively, by filing a <u>Romero</u>[2] motion, which convinced the trial judge to strike two of the prior strike convictions.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

//

//

//

---

[2]  In <u>People v. Superior Court (Romero)</u>, 13 Cal. 4th 497 (1996), the California Supreme Court interpreted the language of California Penal Code section 1385(a) and held a trial court may, on its own motion or motion of a party, strike prior felony conviction allegations in a case brought under California's Three Strikes Law.

48

F

Petitioner claims the trial court improperly imposed a restitution fine.  Doc. 1-1 at 21-22.

Petitioner's claim alleges only a violation of state law, and, consequently, is not cognizable in federal habeas corpus proceedings.  A state prisoner can obtain federal habeas corpus relief only if he is held "in violation of the Constitution or laws and treaties of the United States."  Engle v. Isaac, 456 U.S. 107, 119 (1982).  Federal habeas corpus is not available for attacks on violations of state law or procedure, Estelle v. McGuire, 502 U.S. 62, 67 (1991), and is "'unavailable for alleged error in the interpretation or application of state law.'"  Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1994) (quoting Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985)).

Further, habeas corpus is the appropriate remedy for a state prisoner who challenges "the fact or duration of his confinement and seeks immediate or speedier release."  Heck v. Humphrey, 512 U.S. 477, 481 (1994).  The federal writ of habeas corpus is available only to persons "in custody" at the time the petition is filed.  28 U.S.C. §§ 2241(c), 2254(a); see Carafas v. LaVallee, 391 U.S. 234, 238 (1968).  In general, custody is satisfied where the sentence imposed "significantly restrain[s] [a] petitioner's liberty to do those things which in this country free men are entitled to do."  Jones v. Cunningham, 371 U.S. 236, 243 (1963).  A monetary fine is not a sufficiently significant restraint on liberty to satisfy the custody requirement.  See Dremann v.

49

<u>Francis</u>, 828 F.2d 6, 7 (9th Cir. 1987).  Nor does the fact that Petitioner also challenges his custody suffice to confer jurisdiction on this Court to review his restitution claim by way of a federal habeas petition.  <u>See</u> <u>United States v. Thiele</u>, 314 F.3d 399, 401-02 (9th Cir. 2002) (holding petitioner could not collaterally attack restitution order under § 2255, even where joined with cognizable claims for release from custody).

Accordingly, Petitioner is not entitled to habeas relief on this claim.

G

Petitioner claims there was "juror misconduct and bias" on the part of juror numbers 6, 10, and 12.  Doc. 1-1 at 22.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; <u>see</u> <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  <u>Tinsley v. Borg</u>, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks and citation omitted).  The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias, that is "bias in fact or bias conclusively presumed as a matter of law."  <u>United States v. Gonzalez</u>, 214 F.3d 1109, 1111-12 (9th Cir. 2000) (internal quotation marks and citation omitted).  However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation."  <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  The safeguards of

juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Id.  Due process only means "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id.

The Sixth Amendment guarantee of a trial by jury also requires the jury verdict to be based on the evidence presented at trial.  See Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). Evidence not presented at trial is deemed "extrinsic."  See Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1987).  A finding of juror misconduct on the basis of its consideration of extrinsic evidence "gives rise to a presumption of prejudice that may only be rebutted with strong, contrary proof of harmlessness."  Xiong v. Felker, 681 F.3d 1067, 1077 (9th Cir. 2012) (citing Caliendo v. Warden of Cal. Men's Colony, 365 F.3d 691, 696 (9th Cir. 2004)).

1

Petitioner asserts that during jury selection, he told his trial counsel, Kipp Davis, and the trial judge:

> [J]urors number 6, 10, and 12 were looking at me with very
> negative expressions (similar to hatred).  After
> deliberations juror number six once again looked over at
> me with hatred; after the verdict was read juror number 6
> looked at me, smiled and put her head up as to mock me.

Doc. 1-2 at 26-27; see Doc. 1-1 at 22.

The record shows that during trial, out of the presence of

the jury, Petitioner raised the issue with the trial court:

> The Court: So Mr. Gutierrez, I also understood from
> [defense counsel] Mr. Davis, he indicated to me this
> morning, that you did have some current concerns regarding
> the make up of the jury.  I'd be happy to hear from you at
> this point if you want to talk to me about that issue.

> The Defendant: I just wasn't satisfied with three of them
> that was long before he had passed on the peremptories.  I
> didn't like the way they were staring at me just – I just
> got, like, found, like, they had reservation the way they
> were looking and I wasn't comfortable, so I showed him
> which numbers they were and there was a few there, but he
> agreed on a few of them but some he didn't.  On the three
> remaining I brought to his attention and I wasn't
> comfortable with them and he just left them on there.

> The Court: So, Mr. Gutierrez, the three jurors that you're
> talking about, was it anything about their responses to
> the questions or was it pretty much the vibe you were
> getting?

> The Defendant: The vibe.  Just the way – when they were
> looking at me just felt very uncomfortable.

> The Court: Did you want to respond at all?  Did you have
> the conversation was [sic] Mr. Gutierrez and you indicated
> that for your reasons that you have as a counsel of record
> that were going to have them on the jury?

> Mr. Davis: Yes.  I mean, he basically indicated to me that
> there were some jurors that he didn't care for.  And I did
> indicated to him that I agreed with him on some and
> disagreed on others, and that was, you know, in essence
> the extent of it.  And when I passed for cause or at that
> point I was – I felt that we had a good jury.

> The Court: Okay.

> Mr. Davis: I was satisfied.

> The Court: Mr. Gutierrez, it's important to make a record
> of this stuff.  Not that I'm going to be able to do
> anything about it now, but someone is going to look at our
> case later on and determine what issues are appealable or
> would make a difference.  What we do is what you just did
> right now, you just put it on the record that this
> was a concern of yours.  That you made the representations
> to your counsel that you didn't necessarily want those
> particular jurors.  And later on if someone thinks that's
> a problem we've made a record and they know what we're

talking about.

    The Defendant: I appreciate that.  Thank you.
RT 809-10.

                                2

        As indicated, Petitioner alleges juror misconduct <u>and</u>
bias.[3]  His misconduct claim fails on its face.  Petitioner alleges
only that three jurors looked at him with a "negative" expression
"similar to hatred."  There is no suggestion that Petitioner's
jurors were exposed to extrinsic information, <u>see</u> <u>Bayramoglu v.</u>
<u>Estelle</u>, 806 F.2d 880, 887 (9th Cir. 1986), or refused to deliberate
or otherwise failed to follow the trial court's instructions, <u>see</u>
<u>United States v. Boone</u>, 458 F.3d 321, 329 (3d Cir. 2006).
Petitioner cites no Supreme Court authority, nor is the Court aware
of any, suggesting a jury may commit misconduct of federal
constitutional magnitude by looking at the defendant with a
"negative expression" or other "face."

        Petitioner's juror bias claim also fails.  Petitioner does
not allege circumstances that, even if true, would be sufficient to
warrant relief on a claim of juror bias.  He alleges three jurors
looked him with a "very negative expression" during voir dire.  He
does not allege this occurred more than once.  Further, as
discussed supra, he described it at trial only as a "vibe" he got,
and trial counsel expressly disagreed with Petitioner's assessment.
<u>See</u> RT 809-10.  Petitioner does not allege any reason, or basis, for

_____

        [3]  The Court has reviewed the Reporter's Transcript of jury voir
dire.  Resp. Ex. D.  Nothing in the transcript shows any bias or
impropriety on the part of any selected juror.

the bias he assigns to the three jurors, and none presents itself. Petitioner also does not allege that any of his jurors were untruthful in answering questions posed to them during voir dire or on juror questionnaires, to the extent questionnaires were used. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).  There is no post-trial evidence suggesting any of the jurors were biased or committed some form of misconduct at any time. In short, Petitioner's allegation does not state, let alone prove, a claim of juror bias.  Cf. United States v. DiSalvo, 34 F.3d 1204, 1225 (3d Cir. 1994) ("jurors' expressions of fear or apprehension of a defendant do not, per se, establish juror bias").

Accordingly, Petitioner is not entitled to habeas relief on this claim.

## V

Based on the foregoing, the state court's denial of Petitioner's claims was not contrary to or an unreasonable application of established federal law or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Therefore, the petition for a writ of habeas corpus is DENIED.

Further, a Certificate of Appealability is DENIED.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

1   <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

2          The Clerk is directed to enter Judgment in favor of

3   Respondents and against Petitioner, terminate any pending motions as

4   moot and close the file.

5

6          IT IS SO ORDERED.

7

8   DATED      _9/30/2014_                 _____
                                            THELTON E. HENDERSON
9                                           United States District Judge

10

11

12
    G:\PRO-SE\TEH\HC.11\Gutierrez 11-4740 RUL.wpd
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  55